

Tel: 347-273-1269
Fax: 347-273-1450
Criminal Hotline: 888-369-0674
Email: Mario@galluccilawfirm.com

The Executive Suites at the Garden
1110 South Avenue, Suite 29
Staten Island, New York 10314

Mario F. Gallucci Esq.

June 20, 2025

Honorable John P. Cronan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:    United States of America v. Sandy Carazas-Pinez
>          Case No. 23CR346

The Defendant, Sandy Carazas-Pinez, herein after ("Ms. Carazas-Pinez"), submits the within Sentencing Memorandum in support of the instant Sentencing Hearing scheduled before this Court on July 1, 2025.

## I. INTRODUCTION

Following the progeny of cases stripping the mandatory nature of the United States Sentencing Guidelines, district courts are now fully empowered to consider every aspect of a crime, every quality of a defendant, and every available punishment when fashioning sentences. While Ms. Carazas-Pinez recognizes the seriousness of her offense and the need for just punishment, she respectfully asks this Court to recognize her exemplary life lived up until the instant offense, the collateral consequences already faced, her trauma history, her familial circumstances, and to impose a sentence below the advisory guideline range.

By way of background, on December 16, 2024, Ms. Carazas-Pinez pled guilty in the Southern District of New York under Docket Number 23-CR-346 to Count One of a two count Indictment. Count One charged Ms. Carazas-Pinez with Enticement of Minor Victim to Engage in Illegal Sexual Activity, in violation of Title 18, United States Code, Section 2422(b). Critically, as explained later, Ms. Carazas-Pinez was not required to plead guilty to Count 2, Production of Child Pornography in violation of Title 18, United States Code, Section 2251(a) and 2. During the plea allocution, Ms. Carazas-Pinez was genuine, contrite, remorseful, and accepted full responsibility for her horrific actions.

As stated, the fact that Ms. Carazas-Pinez was only required to plea to Count 1 of the Indictment instead of both counts is worth noting. Specifically, had Ms. Carazas-Pinez pleaded guilty to both counts of the Indictment, she would be facing a mandatory minimum sentence of 15 years rather than the still lengthy 10-year mandatory minimum that she currently faces. Given that the government could have had her plead to a 15-year minimum and chose not to, it is our position that Ms. Carazas-Pinez should not receive a sentence longer than 15 years. Additionally, before this case, Ms. Carazas-Pinez had never been arrested, and there is zero indication that she is a person capable of repeating her conduct, or any type of criminal conduct. In all respects, Ms. Carazas-Pinez's conduct was an anomaly, something that occurred from her unaddressed childhood traumas. As Ms. Carazas-Pinez continues to seek help and therapy, I can assure this court there is no likelihood of it occurring again. The Court should thus consider sentencing Ms. Carazas-Pinez to a term of 120-months followed by five years' supervised release.

As the Court will see from the numerous letters of support attached to this memorandum that Ms. Carazas-Pinez will make the rebuild, rehabilitate, and heal to become the best version of herself. These letters will give an insight into Ms. Carazas-Pinez is like a person, and why she deserves the Court's mercy.

Ms. Carazas-Pinez is deeply remorseful for her actions and fully acknowledges the serious harm caused by her decision to engage in behavior that led to the charge of enticing a minor for sex. She recognizes the gravity of her conduct—not only as a legal violation but as a profound breach of trust and safety that has lasting emotional consequences for the victim and the community. This realization has weighed heavily on her, and she expresses sincere regret for the pain and fear her actions may have caused. Her initial failure to understand the impact of her choices has been replaced by a painful awareness of the damage done.

The shame Ms. Carazas-Pinez feels is overwhelming and constant. She struggles daily with the knowledge that her actions not only harmed another person but also betrayed the values she once believed she upheld. She understands that no excuse can justify what she did, and she carries the burden of that guilt. This shame is not superficial—it runs deep and is reflected in her complete willingness to face the consequences of her actions. She has lost the respect of others, and more importantly, her self-respect, which she is now working diligently to rebuild through honest self-reflection and accountability.

2

she is determined to become a better, safer, and more responsible person, and she hopes, in time, to earn the opportunity to demonstrate that commitment to society.

While Ms. Carazas-Pinez behavior is inexcusable, her misconduct does not define her. She is a loving mother, daughter, friend, and teacher. She has an extensive network of family, friends, and colleagues who not only provide Ms. Ms. Carazas-Pinez with emotional support, but who also rely on her for the same.

As the Court is aware, during some pendency of this case, she was incarcerated in the MDC Brooklyn. She did not let her time in the MDC go to waste. Attached as Exhibit B are Ms. Carazas-Pinez's certificates from the time she was incarcerated. She took numerous classes including a 7-week course called Finally Free: Living In Peace By Releasing Your Past. She completed numerous training courses. She attended religious services and received a recommendation from Rev. Ngozi Osuji. Furthermore, as she did when she was not incarcerated, she continued to get evaluated and treated for mental health.

Additionally, the Government, Probation, and Defense, are all in agreement that the advisory Guidelines range amount to 360 to life of imprisonment (Offense Level 42, CHC I). Additionally, probation found her personal history and characteristics of the defendant, specifically, her upbringing and adverse experiences as well as her mental health history would be grounds pursuant to §3553(a) to consider a sentence the sentencing range. Probation, in their thorough presentence report, recommends 180 months of incarceration. As previously stated, we are asking this Honorable Court to sentence Ms. Carazas-Pinez to 120 months of incarceration.

Our hope is that Your Honor will find that this is a case in which the Court's analysis of the whole person being sentenced and the kinds of sentences available should result in a fair, mandatory minimum sentence.

Ms. Carazas-Pinez has learned a very difficult and valuable lesson. She has realized the error of her ways, is committed fully to never commit a crime again and intends to transform her life through therapy. As described by her brother, Christian Pinez, a counterterrorism officer in the

NYPD, in the PSR, he described Ms. Carazas-Pinez as "headstrong and motivated.". *See* PSR page 17 ¶72. As the Court considers the whole person whom it will sentence, we wish to highlight the following unique facts and circumstances, and unfortunately sad circumstances, of Ms. Carazas-Pinez life and the circumstances surrounding the instant offense:

     (1)   **Sexual Abuse Suffered Growing Up** – There is substantial psychological and criminological research showing that individuals who suffer sexual abuse in childhood are at significantly higher risk for a range of adverse outcomes, including trauma, mental illness, substance abuse, and—in some cases—perpetration of sexual abuse themselves. This pattern does not imply inevitability, nor does it excuse criminal conduct. However, it can help contextualize Ms. Carazas-Pinez's psychological development and impaired judgment. While a lengthy term of incarceration is appropriate, a 10-year sentence with promise of treatment will address the root behavior of Ms. Carazas-Pinez. █████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Your Honor to consider in crafting an appropriate sentence. (*See* PSR, page 37).

     (2)   **Ms. Carazas-Pinez's Conduct Was An Aberration** – Ms. Carazas-Pinez made the worst choice of her entire life. Her actions were incongruous with her character traits. Ms. Carazas-Pinez life has been characterized by hard work and dedication to her family and work. This is her first and only interaction with the criminal justice system, and there is little question that it will be her last;

     (3)   **Ms. Carazas-Pinez's Time Spent In MDC Brooklyn** – Ms. Carazas-Pinez has been incarcerated in MDC Brooklyn since April 15, 2024. As this Court, and the public, are well informed that MDC Brooklyn and the conditions in MDC Brooklyn made it one of the worst prisons to do any extended time in. For reasons that will be discussed later, Ms. Carazas-Pinez should be credited for not surviving these harsh conditions but thriving to complete trainings and therapy.

    As discussed in greater detail below, the factors of 18 U.S.C. §3553(a) demonstrate that the requested sentence meets the ends of justice.

## II.    MS. CARAZAS-PINEZ'S HISTORY & CHARACTERISTICS AND THE NATURE & CIRCUMSTANCES OF THE OFFENSE (§ 3553(A)(1))

Over the past thirty-five years, and apart from the offense conduct, Ms. Carazas-Pinez has led a productive, law-abiding, and family-value driven life. After completing her high school and college education, she has always remained in full-time employment, provided a life for her family, and contributed to his communities. The offense conduct, in this case, was an aberrant mistake for which Ms. Carazas-Pinez took full responsibility. Already the consequences of Ms. Carazas-Pinez's actions have taken a great toll on her and her family. She has lost the reputation and stature that she relied upon to advance her career. Most importantly, Ms. Carazas-Pinez has lost her family. Upon her guilty plea, she gave everything to her now ex-husband including custody of her beloved children, all marital property. She did this because she wanted the best life for her kids. Despite these issues, Ms. Carazas-Pinez has already begun rebuilding her life.

Ms. Carazas-Pinez discussed with me that she's been preparing for life after sentencing. Her ultimate goal is to work and repay his debts to society. As she has a background in teaching, she would like to teach adults when she is released from prison. Additionally, Ms. Carazas-Pinez wants to teach other inmates while she is incarcerated and has been doing this while at MDC. Not only has she worked in the laundry and participated in classes she has also taught, teaching other inmates English.

Despite the successes Ms. Carazas-Pinez achieved in her career, she had a horrible childhood. She was physically, emotionally, and sexually abused. As she discussed with probation, Ms. Carazas-Pinez's mother was the primary disciplinarian. And Ms. Carazas-Pinez was disciplined with corporal punishment. She was beaten from anything from wooden spoons, belt, shoes, anything her mother could get her hands on. Additionally, she did not receive the love and care a child should have had. Her father was busy working, and her mother, as stated, physically abused her. What's worse is the sexual abuse the parents let occur under their watch.

Unfortunately for Ms. Carazas-Pinez, this type of abusive relationship only continued when she married Hugo Carazas. Their relationship was marred in both physical and emotional abuse. Early in their relationship, Hugo's drinking problem surfaced, as he would frequently disappear, leaving her to care for Miley for extended periods. When intoxicated, Hugo often would become physically and verbally violent. However, she felt obligated to remain with him and to care for Miley. They got married in December 2017. Ms. Carazas-Pinez stated Hugo's drinking increased after their son, John Carlo, was born on December 6, 2019. During this period, Hugo's behavior became violent, which included throwing objects and pushing Sandy, although he never directed his aggression toward Miley. Despite recognizing the severe issues, she struggled to confront him about his drinking habits, often finding him unrecognizable when he was drunk.

These circumstances were noted in Dr. Liebert's report as to why Ms. Carazas-Pined acted the way she did and how she could be rehabilitated. Specifically, Dr. Liebert stated that, "Research suggests that different typologies can characterize women who commit sexual offenses. Ms. Carazas-Pinez best fits the "teacher/ lover" typology. Women in this category tend to come from chaotic or dysfunctional families with emotionally distant parents and a history of maladaptive and abusive relationships as an adult. Women in this category also tend to cope with their emotions through unhealthy relationships. In terms of problematic sexual behavior, women in this typology view their victims as equals and tend to minimize the potential for harm to their victims. The quintessential features delineated by research seamlessly dovetail with Ms. Carazas-Pinez's childhood and young adult life. The early experiences of physical and emotional abuse she experienced in childhood resulted in fractured attachment to her primary givers. This hindered Ms. Carazas-Pinez's ability to build a stable sense of self-worth and self-agency. Because of these psychological vulnerabilities, Ms. Carazas-Pinez was more susceptible to entering into unhealthy and abusive romantic relationships. Additionally, via her own experience of repeated sexual victimization, her sense of sexual boundaries and acceptable behaviors was progressively blurred and distorted.

During the time of the instant offense conduct, Ms. Carazas-Pinez stated that she and Hugo were frequently arguing; she was feeling overwhelmed balancing work and motherhood and felt isolated. Simultaneously, she reported that several students were becoming increasingly aggressive and that the school administration was not providing enough support, so she felt unsafe in her

6

classroom. During this time, she recalled that the victim began acting as her "protector," intervening on her behalf if other students became aggressive. Ms. Carazas-Pinez stated that while she knew it was an inappropriate dynamic, she liked feeling cared for. As their relationship progressed, the boundaries of a teacher/student relationship blurred, resulting in sexual contact.

While her complex trauma history and psychosocial stressors do not excuse or negate her conduct, it does provide context as to how she allowed herself to be in such a precarious situation. Given the constellation of factors that contributed to the instant offense, her willingness to engage in treatment, it is the opinion of the undersigned that Ms. Carazas-Pinez risk of sexual recidivism aligns with existing empirical data yielding a low risk, if she is attending therapy in person and consistently, and can comport to probation conditions. It is more likely that she will struggle with probation conditions that are not illegal, however could reflect impulsiveness or poor judgment and serve to meet her need for relational attachment, such as attempting to speak to her children if not approved, dating someone who is legally an adult but significantly younger than her, or spending time out beyond a curfew to be with someone she cares for. Work in treatment on consequential thinking, disconnecting urge from action, and building healthy relationships will help mitigate against this increased likelihood of probation violations/transgressions.

Despite enduring the deep emotional scars of childhood sexual abuse, she emerged as a symbol of strength and perseverance. The trauma she faced in her early years could have defined her path, but she refused to let it break her spirit. Instead, she channeled her pain into determination, working tirelessly to build a life rooted in purpose and resilience. From a young age, she took on responsibilities beyond her years, finding small moments of peace in the structure of work and the pride that came with financial independence.

School became both a refuge and a battleground where she fought hard to prove her worth. Despite the emotional burdens she carried, she excelled academically, earning the respect of her teachers and peers. Her success was not the result of ease but of relentless effort—late nights studying, asking for help when needed, and refusing to let her past interfere with her goals. Education became her way out; a beacon of hope that reminded her she was more than what had been done to her.

As she grew into adulthood, she carried her strength into motherhood. She became a loving, attentive parent, determined to give her children the safe, nurturing environment she never had. Her experiences shaped the kind of mother she chose to be—empathetic, protective, and fiercely

7

devoted. Though her past would always be a part of her, it did not define her; instead, it gave her the power to break cycles, build trust, and raise her children in a home full of love, safety, and dignity.

Ms. Carazas-Pinez guilty plea has thrown away the years of fortitude and hard work. Ms. Carazas-Pinez feels that she has shamed not only herself, but the loved ones around her. She feels that she has tarnished her family name. As she approaches her sentencing, Ms. Carazas-Pinez continues to accept full responsibility for the crimes she committed. The abhorrent offense conduct, in this case, was aberrant behavior for Ms. Carazas-Pinez and there is no excuse for what she did. By way of explanation, and not excuse, the circumstances surrounding. Ms. Carazas-Pinez participation in the instant offense are mitigating because of the trauma she suffered. Additionally, Ms. Carazas-Pinez shows deep remorse and understanding.

> In her letter to the Court, he explains:
> "From the moment I was charged, I have spent every day reflecting on the damage I have caused—not only to the victim, but to their family, my own loved ones, and the community as a whole. What I did was wrong, harmful, and completely inexcusable. I deeply regret my actions, and I wish more than anything that I could undo the pain I have caused."

(*See* Exhibit C - Letter By Sandy Carazas-Pinez [Emphasis Added]

### III.  Remaining Factors of 18 U.S.C. § 3553(a)

*a.*    *The Need for the Sentence Imposed to Reflect the Seriousness*
     *of the Offense, to Provide Just Punishment, to Avoid Unwarranted*
     *Sentence Disparities, and to Promote Respect for the Law*

As the Court reflects upon the person being sentenced, I urge Your Honor to consider that the requested sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities.

8

Ms. Carazas-Pinez's misconduct is not a fair representation of her character. She has proven to a community of people that she is a kind and caring person who is always willing to give her time, her energy, and her financial support to lift the people around her.

The letters written on Ms. Carazas-Pinez's behalf demonstrate that there is a community of people who love and support her. The consistent themes woven throughout the various letters of support highlight Ms. Carazas-Pinez's kindness, empathy, generosity, and loyalty. These family and community members know about the serious nature of this case and that the law requires she must be incarcerated, yet they ask for leniency because they know that there is much more to Ms. Carazas-Pinez's than her past mistakes. As the Court can reflect on the letters of support provided, they will see the full picture of Ms. Carazas-Pinez and can fashion an appropriate sentence balancing the seriousness of the offense with Ms. Carazar-Pinez as a person. *See Exhibit D* – Letters of Support)

Giving Ms. Carazas-Pinez's a sentence of 120 months will be a just punishment for the offense. For its part, the United States Sentencing Commission has noted that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alterative sanctions for first-time and nonviolent offenders." Alternative Sentencing in the Federal Criminal Justice System, *United States Sentencing Commission*, January 2009, pg. 1. While the offense here is dangerous as the welfare of a minor and the innocence of a child was taken away, I submit the mitigating circumstances and the fact it is a first offense necessitates that a 10-year sentence will be sufficient punishment.

Additionally, like any felon, Ms. Carazas-Pinez's has been forced to navigate numerous collateral consequences of her conviction. As Professor Michelle Alexander has reminded us, "[m]yriad laws, rules, and regulations operate to discriminate against sex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of "civi[l] death" and send the unequivocal message that "they" are no longer part of "us." Michelle Alexander, The New Jim Crow 142 (2010). She will be forced to register as a sex offender for the rest of her life. Given all these consequences, I submit that Ms. Carazas-Pinez's does not need to be imprisoned more than 10 years to be sufficiently punished.

Furthermore, Ms. Carazas-Pinez has spent a year incarcerated at MDC Brooklyn. The Court is no doubt aware of the inhumane conditions at MDC. The lockdowns – solitary confinement – have been constant. Violence abounds. It occurs suddenly and in the middle of units. Ms. Carazas-Pinez's, like many, walks around in constant fear of what could break out; it leads to a constant tension and anxiety that tortures and lingers.

The harsh and trying conditions of confinement at the MDC over the past several years warrants a downward variance. In a scathing decision filed on January 4, 2024, one judge in New York refused to send a defendant who pleaded guilty to selling fentanyl to the MDC even upon his guilty plea. *United States v. Gustavo Chavez*, 22-Cr-303, Doc. No. 31 filed 1/4/2024. Judge Furman detailed the conditions of confinement at the MDC including the "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care." *Id.* at 1-2. The first of the "dreadful" conditions the Court emphasized was the "inordinate amount of time on 'lockdown'- that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise." *Id.* at 9. As the Court noted, "confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane." *Id.* at 10 *citing Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari).

Confining inmates to cells means, as a practical matter, that they live in bathrooms. They are not able to bathe regularly. They shared the cramped space with another woman and a toilet. They have limited access to loved ones and no access to rehabilitative programming. Locked in cells, the only available water at MDC was at times the brown water from the sinks. The lockdowns also place limits on commissary purchases. Far from luxury items, food from the commissary is an important way for inmates to supplement their nutrition as they feel that MDC does not always provide enough edible food during the lockdowns. And while access to showers is not as significant as access to food, being kept away from basic hygiene for extended periods is significant and dehumanizing.

Under these harsh conditions, each day in jail has been far more punishing than what the Sentencing Commission contemplated when it measured the Guidelines. The Court can and should consider these conditions when formulating a sentence. *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001) (abnormally harsh presentence conditions can be grounds for a downward departure); *United States v. Torres*, 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) (downwardly departing because the "enhanced deprivations . . . and suffering" by the defendant who was held in pretrial detention in Colombia would produce "a magnitude of punishment effectively disproportionate"). Courts in this district have recognized that time in jail now is "just a harder time . . . than a defendant would normally serve, given the circumstances of the pandemic." *United States v. Justo*, 20 Cr. 135 (JMF), August 5 Transcript at 15-16; *see also United States v. Edwards*, 20 Cr. 618 (VLB) (S.D.N.Y.) (custody during COVID "unusually harsh"); *United States v. Battle*, 20 Cr. 349 (EK) (harsh conditions tantamount to unearned disciplinary segregation or worse); *United States v. Martinez*, 18 Cr. 669 (JPO) (SDNY) (time spent in MCC during COVID equivalent to 1.5 to 2 times the normal time); *United States v. Browning*, 20 Cr. 002 (VSB) (S.D.N.Y.) (not the fault of the BOP but concluding that there was no question that the time was more difficult).

Given these conditions, a term of 120 months would be appropriate.

10

Finally, the requested sentence would not result in a disparity. An evaluation of the Sentencing Commission's sourcebook[1] reveals that a significant percentage of cases in this Circuit and District result in variant sentences. Of the 3,050 defendants sentenced in the Second Circuit in 2024, only 931 (30.5%) received a within-the-guidelines sentence, while 1,555 (51%) received a variance from the advisory Guidelines sentencing range. And of the 1,042 defendants sentenced in the Southern District of New York, only 239 (22.9%) received a within-the-guidelines sentence, while 683 (65.5%) received a variance from the advisory Guidelines sentencing range.

While every case presents different facts and circumstances, given the unique circumstances of Ms. Carazas-Pinez, her remorse and acceptance of responsibility, and the significant collateral consequences she has faced, the requested sentence would not represent a disparity in sentencing.

b. *The Requested Sentence Can Provide Adequate Deterrence, and Protect the Public from Future Offenses by Ms. Carazas-Pinez*

A ten-year sentence with a five-year of supervised release can provide adequate general and specific deterrence.

The available empirical evidence does not support the finding that incarceration leads to increased deterrent effects, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

While we appreciate the need for general deterrence, it appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies. *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011); *See* Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.

Studies show that the same is true of specific deterrence; except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and a term of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*,

---

[1] *See* United States Sentencing Commission Sourcebook of Federal Sentencing Statistics for Fiscal Year 2022

33Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Respectfully, Ms. Carazas-Pinez is a low-risk offender who has demonstrated that she does not need to be incarcerated longer than the mandatory minimum to be deterred. The available social science research indicates to low recidivism rates for offenders with little or no prior criminal history. In 2004, the United States Sentencing Commission ("U.S.S.C.") issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004. In its report, the U.S.S.C. notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy [...] postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.

*See id.* at p. 1; *see also* 28 U.S.C. § 994(j).

The U.S.S.C. found that offenders, like Ms. Carazas-Pinez, with zero criminal history points, have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points). (*See* id. at p. 13-14, 26).

Looking at Ms. Carazas-Pinez entire life, there is no doubt that she is someone the Court can be confident will not re-offend. Ms. Carazas-Pinez has demonstrated, both before her involvement in instant criminal conduct and particularly in the years since her arrest in that she can live a law-abiding and productive life. She has a treatment plan, she has support, and I have the utmost confidence that Ms. Carazas-Pinez will not reoffend.

For a variety of reasons, including Ms. Carazas-Pinez s personal history, the positive steps she has already taken to rehabilitate herself, and the support she will have from a large community of family and friends, I do not believe that Ms. Carazas-Pinez presents any danger of reoffending.

## IV. CONCLUSION

On behalf of Ms. Carazas-Pinez and her family, I thank the Court for taking the time to consider our sentencing submission. We look forward to addressing the Court on July 1, 2025.

Dated:    Staten Island, New York
          June 20, 2025

Respectfully submitted,

/s/ *Mario Gallucci*
Mario Gallucci

cc:    A.U.S.A. Mitzi Steiner

13